*JOHN H. TAPHORN V. THEODORE TAPHORN ET AL.

1. DEEDS ACCOMPLISHING RESULTS OF WILL PREVIOUSLY EXECUTED
WILL NOT BE SET ASIDE FOR UNDUE INFLUENCE OF INFIRM PARENT
AFTER STROKE OF PARALYSIS.

Deeds executed by a father to his sons accomplishing the same
result achieved by the grantor's executing a will six years be-
fore when no doubt existed as to his mental condition or
freedom of action, will not be set aside for undue influence
and lack of mental capacity of grantor following an attack
of paralysis, notwithstanding doubt by the reviewing court as
to the weight of evidence as to his mental capacity and fair-
ness of the influence exerted by his sons.

2. BURDEN OF PROOF UPON GRANTOR TO SET ASIDE DEEDS FOR UNDUE
INFLUENCE.

Undue influence in deeds of gift from parent to child will not be
presumed as in like deeds from child to parent but it must be
proved by clear and convincing evidence by grantor to set
aside such conveyances; hence, the burden of proof is not on
grantees to show that the transaction is fair and free from
such influence.

ERROR to Hamilton common pleas court.

*J. C. Healy*, for plaintiff in error.

*Louis J. Dolle, Walter C. Taylor* and *J. B. O'Donnell*, for
defendant in error:

As to the capacity of the grantor. *Kime* v. *Addlesperger*,
24 O. C. C. 397 (2 N. S. 270); *Pepple* v. *Pepple*, 7 Circ. Dec. 102
(13 R. 43).

As to the effect of the hemiplegia. *Delaplain* v. *Grubb*, 44
W. Va. 612 [30 S. E. Rep. 201; 67 Am. St. Rep. 788]; *Meyer* v.
*Jacobs*, 123 Fed. Rep. 900; *Bowdoin College* v. *Merritt*, 75 Fed.
Rep. 480; *Ralston* v. *Turpin*, 129 U. S. 663 [32 L. Ed. 747];
*Sawyer* v. *White*, 122 Fed. Rep. 223; *Lore* v. *Truman*, 1 Dec. Re.
510 (10 W. L. J. 250); *Kime* v. *Addlesperger*, 24 O. C. C. 397
(2 N. S. 270); *Pepple* v. *Pepple*, 7 Circ. Dec. 102 (13 R. 43); 13
Cyc. 573; *Taphorn* v. *Taphorn*, 18 Dec. 743 (6 N. S. 579); *Willis*

---

*Affirming *Taphorn* v. *Taphorn*, 18 Dec. 748.

Taphorn v. Taphorn.

v. *Baker,* 75 Ohio St. 291 [79 N. E. Rep. 466]; *Commercial Nat.
Bank* v. *Wheeiock,* 52 Ohio St. 534 [40 N. E. Rep. 636; 49 Am.
St. Rep. 738]; *Stewart* v. *Gordon,* 60 Ohio St. 170. [53 N. E.
Rep. 797]; *Ford* v. *Osborne,* 45 Ohio St. 1 [12 N. E. Rep. 451; 4
Am. St. Rep. 507]; *Potter* v. *Potter,* 27 Ohio St. 84; Bigelow,
Fraud pp. 357, 358, 359; *Clark* v. *Clark,* 174 Pa. 309 [34 Atl.
Rep. 610]; *Saufley* v. *Jackson,* 16 Tex. 579; 2 Pomeroy, Eq.
Jurisp. (3 ed.) Sec. 962; *Burwell* v. *Burwell,* 103 Va. 314 [49
S. E. Rep. 68]; *Orr* v. *Pennington,* 93 Va. 268 [24 S. E. Rep.
928]; *Mackall* v. *Mackall,* 135 U. S. 167 [10 Sup. Ct. Rep. 705;
34 L. Ed. 84]; *Towson* v. *Moore,* 173 U. S. 17 [19 Sup. Ct. Rep.
332; 43 L. Ed. 597]; *Oliphant* v. *Liversidge,* 142 Ill. 160 [30 N.
E. Rep. 334]; *Prescott* v. *Johnson,* 91 Minn. 273 [97 N. W. Rep.
891]; *Wessell* v. *Rathjohn,* 89 N. C. 377 [45 Am. Rep. 696];
*Yeakel* v. *McAtee,* 156 Pa. St. 600 [27 Atl. Rep. 277]; *Haynes* v.
*Harriman,* 117 Wis. 132 [92 N. W. Rep. 1100]; *Vance* v. *Davis,*
118 Wis. 548 [95 N. W. Rep. 939]; *Truman* v. *Lore,* 14 Ohio St.
144; *Wise* v. *Foote,* 81 Ky. 10; *Rewell* v. *Warden,* 24 O. C. C 344
(4 N. S. 545); *Hammond* v. *Welton,* 106 Mich. 244 [64 N. W. Rep.
25]; *Francis* v. *Wilkinson,* 147 Ill. 370 [35 N. E. Rep. 150];
*Sturtevant* v. *Sturtevant,* 116 Ill. 340 [6 N. E. Rep. 428];
*Hamilton* v. *Smith,* 57 Iowa 15 [10 N. W. Rep. 276; 42 Am. Rep.
39]; *Howe* v. *Howe,* 99 Mass. 88; *Taylor* v. *Taylor,* 41 N. C. 26
[51 Am. Dec. 412]; *Likins* v. *Likins,* 122 Mo. 279 [27 S. W. Rep.
531]; *Millican* v. *Millican,* 24 Tex. 426; *Robinson* v. *Allbee,* 4
Circ. Dec. 185 (12 R. 663).

### GIFFEN, P. J.

The original action was commenced to set aside, on the
ground of undue influence and mental incapacity, four deeds
conveying all the real estate of the grantor to his two sons,
Theodore and John. A decree was entered for the defendants
which it is now sought to set aside.

In deeds of gift from parent to child undue influence will
not, because of that relation, be presumed as it sometimes is in
deeds of gift from child to parent, but must be proved like other
issues of fact.

The due execution and delivery of the deeds having been

established, the burden did not rest upon the defendants to show that the transaction was fair and free from undue influence; but on the contrary the burden was cast upon the plaintiff to establish by clear and convincing proof one of the grounds relied upon to set aside the deeds. *Willis* v. *Baker*, 75 Ohio St. 291 [79 N. E. Rep. 466].

The degree of influence that will be undue is relative and dependent upon the circumstances of each case. If the grantor is old and his mind weakened by disease, slight influence may be sufficient to overcome his power of resisting the importunities of those about him, and thereby become undue, although under other conditions it could not be so regarded. The relation of the sons to the father in this case prior to January 5, 1907, was one of dependence rather than authority over him, and if at the time the deeds were executed (January 10, 1907), they exerted any undue influence, it was possible only because of his weak mental condition resulting from a stroke of paralysis suffered on January 5, 1907.

It is important, therefore, to inquire to what extent, if any, his mind was affected thereby. The testimony shows that he suffered a marked and distant hemiplegia as the result of a hemorrhage of the brain, from which he has never fully recovered, although the improvement has in many respects been remarkable. He was, at the time, past eighty years of age but apparently in good health except a condition of arterio-sclerosis thickening and hardening of the arteries.

The only expert testimony in the case was offered by the plaintiff, and Dr. G. A. Fackler, a specialist in nervous diseases who examined the patient on the morning of the day following the stroke, testified as follows:

"At the time of my visit he was almost totally unconscious. With some difficulty and some efforts at arousing him, he would be aroused. Nothing more than an exclamation. One or two words. Nothing further. He was to all intents and purposes in an unconscious state. His entire left side was immovable. No motion to the arms or legs or the left side of the face.

"Q. What was the condition of his intellect at that time?

Taphorn v. Taphorn.

A.   Absolutely in abeyance.   He had no intellect at the time at all.

"Q.   And with reference to the will what would you say was his power? A.   He had no will power at all at that time. He was unconscious practically."

It is manifest from this testimony that the patient, at that time, was incapable of transacting any business or of knowing the amount of his property and the natural objects of his bounty.

Dr. LaFayette Neufarth, the attending physician, testified as follows:

"Q.   Do you remember whether or not you saw him with Dr. Fackler? A.   Yes, sir; I seen him with Fackler.   I believe that was on Sunday evening.

"Q.   What was his condition at that time?   A.   That left side was devoid of feeling and motion and I think even the face.   Although he could use his tongue, and drink   some,   he could not use his lips very well, or drink without spilling a good deal of the water that he attempted to drink.   I don't remember whether he could take several swallows of the liquid, but he could drink some; but the sense of feeling and motion was completely gone.

"Q.   How was he at that time with regard to maintaining a conversation with anyone?   A.   I guess he was very much in the morning as the day before. · You could get his attention and get an answer straight, but his mind would not say, didn't stay long enough to carry on much of a conversation, or remember very much of what was going on.

"Q.   Fully a week or ten days before there was any marked change?   A.   Yes, sir.

"Q.   Do you remember being present when Mr. Hauck was there with some papers for the purpose of having him sign them? Did he ask you any questions with regard to his condition?   A. Yes, sir.

"Q.   Was that the day on which the papers were signed or before, do you remember?   A.   I don't know that.   I was in there one day to see the old gentleman when Mr.   Hauck was there in the sitting room, and asked me whether Mr. Taphorn

was in a condition to do business. Of course standing right on the side of the bed with Mr. Taphorn in it and looking right at me. I said he was. The old gentleman was in bed right in front of me lying down.

"Q. I will ask you what his condition was mentally at that time? A. When you attracted his attention he would answer you apparently clearly, but then he would either go to sleep or talk on some subject not in connection, not answer your question. He would talk of something that had no direct connection with the affairs that were going on.

"Q. I will ask you, were there any symptoms to your mind indicated his mental condition on the tenth day of January? A. As I said before you could not retain his attention. He would answer your question apparently mechanically, and then would wander off to something else or on some other subject or just lay without saying anything."

This testimony was much shaken in the cross-examination when the witness's attention was directed to his deposition taken nearly a year before, in which he testified that the patient recognized and conversed in an intelligent manner with those about him, and described his sensations at the time he was stricken, and that in his opinion Mr. Taphorn on the ninth and tenth day of January understood both the amount of his property and who his children and grandchildren were. Yet upon examination concerning his deposition he stated facts and drew conclusions in harmony with his testimony in chief. There are, however, so many contradictions throughout his testimony that it would be very unsafe to base any judgment upon it. Of one fact he testifies clearly and that is, having heard in another part of the house that Mr. Taphorn was about to transfer some property, he suggested to him that he protect the old lady, his wife; but even this seems to have made no impression on the mind of Mr. Taphorn, as he gave no instructions to Mr. Hauck, the attorney, to make provision for his wife; but it was done by the latter of his own motion, although approved by Mr. Taphorn before signing the deeds.

Dr. B. F. Beebe examined the patient the day before he

Taphorn v. Taphorn.

testified, and about a year after the hemorrhage, and while he says that he found the mental condition much better than he expected, an unusual mental condition so far as a man of his age is concerned, yet his testimony throws very little light on the question of the grantor's mental condition at the time the deeds were executed and delivered.

It is undisputed that about six years prior to the execution of the deeds Mr. Taphorn executed a will in which he devised all his property to his sons, John and Theodore, and which was then still in force—that the sons, believing that the will might be more easily set aside, importuned the father to execute deeds instead, which he steadfastly refused to do up to the time of his illness. He himself testifies that he has no recollection of Mr. Hauck bringing four deeds to him to be signed or of hearing them read, although he remembers being requested to and that he did sign something.

On the other hand the evidence shows that on the seventh or eighth of January he instructed his housekeeper, Mrs. Buenning, to go to Hamilton and ascertain whether a note for $5,000 on which he was endorser, and which had been protested, had been since paid; that about the same time he instructed his sons to buy some pigs, but strangely enough, after the purchase was made, he requested the sons to bring the live pigs in a crate into his bedroom that he might see them; that he directed his housekeeper to deliver to his son the keys to certain drawers in his desk for the purpose of procuring certain deeds and other papers; and that he recognized his friends and members of the family and conversed with them on different subjects, but more particularly concerning his physical condition.

Each and all of these facts indicate that he was conscious and rational to that degree necessary to perform such acts, although not necessarily that he comprehended the scope and effect of the deeds at the time they were executed. The circumstances surrounding the execution of the deeds, including the anxiety of the sons to have title by deeds rather than devise; the declaration of one of the sons to the attorney, "whatever you do make it stick"; the effort to secure a particular witness from a

### Hamilton County.

distance of a half a mile, when there were present in the house persons competent to act; the extreme effort required by the grantor to sign his name although he had, as one witness testified, a firm grip in his right hand, and his crying at intervals during the performance, cause us to doubt his mental capacity and the fairness of the influence exerted by the sons; but a mere difference of opinion upon the weight of the evidence will not justify the reversal of a decree, and as the doubt entertained is not of that convincing nature required, we are constrained to affirm the judgment, and do it with less reluctance because the deeds accomplish substantially the same thing that the grantor had, six years prior, attempted to do by a written will, and had repeatedly reaffirmed when there was no question of his mental capacity or of undue influence.

Judgment affirmed.

**Swing** and **Smith, JJ.,** concur.